IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**GEORGE M. PARKER**                                                                                   **PLAINTIFF**

v.                                          **CASE NO. 5:21-cv-05137-TLB**

**UNITED STATES OF AMERICA**                                                              **DEFENDANT**

## COMPLAINT

COMES NOW, the Plaintiff, George M. Parker, by and through his undersigned counsel, and for his Complaint, states and alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1. George Parker was a resident of the State of Arkansas, residing in Sebastian County, Arkansas at all times relevant to this complaint.

2. The Veterans Health Care System of the Ozarks, also known as the Fayetteville VA Medical Center (hereinafter referred to as "Fayetteville VA"), is operated by the Veterans Health Administration of the United States Department of Veterans Affairs ("VHA" hereinafter), a department within the executive branch of the United States government.

3. The Fayetteville VA operates as a medical center that provides veterans with inpatient and outpatient medical care, including primary care, mental health care, surgical, dental, optometric, chiropractic, preventive health, non-institutional extended care, medical devices, and medical-related incidentals for veterans in twenty-three counties in Northwest Arkansas, Southwest Missouri, and Eastern Oklahoma.

1

4. The Fayetteville VA is located at 1100 North College Avenue in Fayetteville, Arkansas, within the territorial jurisdiction of the Western District of Arkansas, Fayetteville Division.

5. Mr. Parker served in the U.S. Army. He was awarded the National Defense Service Medal and the Armed Forces Expeditionary Medal. By virtue of his service in the United States military, Mr. Parker was eligible to and did receive medical care through the United States Department of Veterans Affairs.

6. This is an action brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* against the United States of America. Mr. Parker's personal injuries were proximately caused by the negligence, medical malpractice, wrongful acts and/or omissions of employees of the Fayetteville VA while acting in the course and scope of their employment.

7. This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1346(b).

8. Venue is proper herein pursuant to 28 U.S.C. § 1402 because this is a civil action involving claims against the United States, and the acts and omissions giving rise to the claim occurred in the Western District of Arkansas.

9. Additionally, at all times referred to herein, Defendant, its agencies, employees, and agents were acting under the color of state and federal law, statutes, ordinances, regulations, policies, customs, practices, and usages of the United States of America, pursuant to their authority thereunder.

<u>**FACTUAL ALLEGATIONS**</u>

10. George M. Parker was a patient at the Fayetteville VA Hospital. On or around February 2009, a Fayetteville VA registered nurse became concerned when Mr. Parker presented

with elevated Prostate-Specific Antigen (PSA) levels.  Mr. Parker underwent a biopsy to determine the cause of the elevated PSA levels.  Pathology materials related to the biopsy were sent to Dr. Robert Morris Levy ("Dr. Levy" hereinafter) at the Fayetteville VA for examination and diagnosis.

11. Dr. Levy was a board-certified anatomic and clinical pathologist and a board-certified hematologist.  Dr. Levy was issued a medical license number by the Mississippi State Board of Medical Licensure in 1997 and, at various times, also held medical licenses in California, Florida, and Louisiana.

12. Dr. Levy's duties as Service Chief of Pathology and Laboratory Medicine Services at the Fayetteville VA included, but were not limited to, rendering diagnoses after examining fluid and tissue samples obtained from Fayetteville VA patients; entering information into patients' medical records; assisting radiologists, surgeons, and others during needle biopsies; ensuring that quality standards were maintained for anatomical and clinic laboratory studies; and reporting errors that occurred at the Fayetteville VA pathology laboratory.  Dr. Levy also chaired the tumor board and served on various oversight boards and medical committees at the Fayetteville VA.  He was responsible for ensuring the compliance of the pathology department with the protocols and procedures of national laboratory and hospital accreditation agencies.

13. Patients, to specifically include Mr. Parker, as well as doctors and other medical providers at the Fayetteville VA reasonably relied upon the accuracy of the diagnoses made by Dr. Levy and the integrity of the information he entered in patients' medical records which largely influenced decisions about the course of their medical treatment.

14. During Dr. Levy's employment at the Fayetteville VA, Dr. Levy abused drugs and alcohol, being regularly intoxicated while providing medical services to VA patients in the course and scope of his employment.  Dr. Levy admitted to OIG investigators that he had been an

alcoholic for 30 years and purchased a substance, 2-methyl-2-butanol (2M-2B), online that could be ingested, was similar to alcohol but more potent, and was not detectable using routine drug and alcohol testing methods. *See* Office of Inspector General, *Pathology Oversight Failures at the Veterans Health Care System of the Ozarks in Fayetteville Arkansas*, at 1 (June 2, 2021) ["OIG Report" hereinafter] (attached hereto as Exhibit "A").

15. Oftentimes, while under the influence of drugs and alcohol in the course and scope of Dr. Levy's employment with the Fayetteville VA, Dr. Levy exhibited obvious symptoms of inebriation that were readily apparent to those around him, including fellow employees at the Fayetteville VA.  In fact, Special Agent Kris Raper, Department of Veterans Affairs, Office of Inspector General, testified during Dr. Levy's criminal sentencing hearing that Fayetteville VA employees suspected Dr. Levy of being intoxicated "on the job." *See* Transcript of Sentencing Hearing at 96:12-20, United States v. Robert Morris Levy, No. 5:19-CR-50059 (W.D. Ark. Jan. 21-22, 2021) ["Sentencing Transcript" hereinafter] (attached hereto as "Exhibit B").  Agent Raper further testified that witnesses reported seeing Dr. Levy drinking in his car in the Fayetteville VA parking lot, "smelling like alcohol," and finding a cup containing alcohol next to a microscope. Sentencing Transcript, at 97:22-98:1; 100:4-9.

16. It was also documented that staff reported Dr. Levy being "abrupt, loud, slurring his words, and difficult to understand" while reviewing patient biopsy materials and presented to work on more than one occasion with red, glassy eyes. OIG Report, at 26.  Further, in a 2015 interview regarding Dr. Levy, several staff members reported smelling the "odor of alcohol approximately weekly or monthly for at least seven years" of Dr. Levy's employment at the Fayetteville VA.  *See* OIG Report, at 19.

17. Employees indicated that they observed Dr. Levy's impaired behavior but often hesitated reporting because they were told "whistleblowers were fired," felt belittled after reporting, were worried about reprisal, and thought others were reporting the issue instead. *See* OIG Report, at 47.

18. In September 2005, the Fayetteville VA hired Dr. Levy as a locum tenens (temporary) pathologist. At the time the Fayetteville VA hired Dr. Levy, Dr. Levy disclosed on his Declaration for Federal Employment a 1996 conviction for driving under the influence of alcohol. *See* OIG Report, at 8.

19. One month later, on October 16, 2005, the Fayetteville VA transitioned Dr. Levy to a full-time position as Chief of Pathology and Laboratory Medicine Services, subject to a two-year probationary period. In the month between Dr. Levy's hiring as locum tenens and becoming Chief of Pathology and Laboratory Medicine Services, he reviewed 161 cases, resulting in nine level 2 diagnostic errors (5.59 percent). Level 2 diagnostic errors are those in which a reviewer disagreed in the patient's diagnosis with minimal or no potential negative impact on patient care. An error rate above 0.7 percent is supposed to trigger a review of a VHA pathologist's practice. *See* OIG Report, at 38, footnote 107 ("Guidance from the VA path and lab program suggested an error rate exceeding 0.7 percent be viewed with concern").

20. During a span of approximately two-and-one-half months, from mid-October of 2005 to the end of 2005, Dr. Levy reviewed 481 cases, resulting in 43 level 2 and level 3 diagnostic errors (8.94 percent). Level 3 diagnostic errors are those in which there is a "major discrepancy in diagnosis that could possibly or potentially lead to complications or damage in [the patient's] health care." *See* Sentencing Transcript, at 42:5-9.

21. Dr. Levy maintained a high error rate throughout his employment at the Fayetteville VA. From 2006 to 2007, Dr. Levy reviewed 5,601 cases, resulting in 489 level 2 and level 3 diagnostic errors (8.73 percent). Dr. Levy was the only pathologist at the facility from 2005 to 2007, and his performance was not evaluated by providers with comparable training and privileges in pathology. *See* OIG Report, at 8-10. Consequentially, between 2005 and 2007, facility leaders identified no practice concerns.

22. The Fayetteville VA hired a second pathologist in 2008, Dr. Paul Hendrycy – a subordinate to Dr. Levy – who expressed concerns about disagreeing with Dr. Levy because Dr. Levy evaluated Dr. Hendrycy's performance. *See* OIG Report, at 13. From 2008 to 2011, Dr. Levy reviewed 10,898 cases, resulting in 1,000 level 2 and level 3 diagnostic errors (9.18 percent). Despite the increasing error rate, the Fayetteville VA continued approving Dr. Levy's privileges.

23. On or around March 24, 2009, Dr. Levy reviewed Mr. Parker's pathology materials and incorrectly found the biopsy negative for prostate cancer. Following the misdiagnosis, Mr. Parker continued to present with elevated PSA levels through 2018, some reaching as high as 11.37.

24. Following his misdiagnosis of Mr. Parker, Dr. Levy continued to present with a high error rate. From 2012 to 2013, Dr. Levy reviewed 4,425 cases, resulting in 494 level 2 and level 3 diagnostic errors (11.16 percent). Still, evaluations of Dr. Levy by the Fayetteville VA did not reveal concerns during the two-year period.

25. In March 2014, the Fayetteville VA Chief of Staff, Dr. Mark Worley, met with Dr. Levy after receiving reports that Dr. Levy's breath smelled of alcohol while at work. Dr. Levy claimed that the smell was from a juice mixture he drank to lose weight, and the improbable explanation was accepted by Dr. Worley who took no further investigative actions. *See* OIG

Report, at 17-18. Further actions, including a comprehensive review of Dr. Levy's past cases, which might have informed Mr. Parker's treatment providers of Dr. Levy's misdiagnosis, were not taken.

26. A look-back review for the cases reviewed by Dr. Levy in 2014 identified 291 level 2 and 3 diagnostic errors, out of 2,665 cases, constituting a 10.92 percent error rate.

27. In September and October 2015, staff again reported on two occasions that Dr. Levy smelled of alcohol, exhibited hand tremors, and displayed red eyes at work. Dr. Levy consented to a blood alcohol content test, but the Fayetteville VA did not administer one. No further investigation was conducted. *See* OIG Report, at 19-21. Had such investigation been conducted at the time of these reports, past cases more likely than not would have been comprehensively reviewed, revealing Mr. Parker's erroneous diagnosis.

28. On March 22, 2016, Dr. Levy exhibited signs of impairment while reviewing pathology slides during a liver biopsy. Dr. Worley reported that Dr. Levy was abrupt, loud, slurring his words, and difficult to understand. A blood alcohol content test revealed that Dr. Levy's blood alcohol content at work was 397.6 mg/dL. Dr. Worley noted that the blood alcohol content was "high enough to induce a coma in a person without tolerance to alcohol" and that it was "consistent with a long-term user of alcohol who had built up tolerance to its effects." OIG Report, at 27.

29. Following the results of the blood alcohol content test, Dr. Levy was suspended. However, a comprehensive review of Dr. Levy's past cases was still not conducted.

30. Before Dr. Levy returned to duty, Dr. Hendrycy alleged that Dr. Levy had subverted Pathology and Laboratory Medicine quality management programs and had repeatedly misrepresented second reviews of cases. Dr. Hendrycy listed 76 prostate biopsy cases dating back

7

to 2009 in which Dr. Levy had falsely indicated in the pathology reports that Dr. Hendrycy had concurred with the diagnoses. Dr. Hendrycy recommended a 100 percent past review of Dr. Levy's cases if the Fayetteville VA "want[ed] to make sure that no veterans have been harmed by Dr. Levy's diagnoses[.]" OIG Report, at 29.  Dr. Worley instead "expressed concern that [Dr. Hendrycy] was trying to get Dr. Levy fired." *See* OIG Report, at 30.

31. Dr. Hendrycy's concerns were largely ignored, and Fayetteville VA supervisors recommended that Dr. Levy's clinical privileges be reinstated. Dr. Levy returned to his position on October 12, 2016 with no review of his past cases.

32. From October 12 to December 19, 2016, after Dr. Levy returned to the Fayetteville VA following suspension, he reviewed 494 cases, resulting in 69 level 2 and level 3 diagnostic errors (an unimaginable error rate of 13.97 percent).

33. On October 13, 2017, Dr. Levy again appeared to be impaired at work. He was documented to be "drowsy, had glassy eyes, slurred his words, repeated nonsense words and phrases, and had an unsteady gait." OIG Report, at 36. Dr. Levy was subsequently suspended. However, a comprehensive lookback review of Dr. Levy's past cases – to ensure that no veterans were harmed by Dr. Levy's impairment at work – was not conducted in 2017.

34. In 2018, Dr. Levy's privileges were permanently revoked after Dr. Levy was arrested on suspicion of driving while intoxicated. At the time of his arrest Dr. Levy was in the parking lot of a post office just blocks away from the Fayetteville VA, still wearing his scrubs. Dr. Levy told the arresting officer that he had just come from his job at the Fayetteville VA. Video footage of the arrest showed that Dr. Levy was so inebriated, he could not stand upright, walk, talk, or even count to five. Following his arrest, a comprehensive lookback review of Dr. Levy's past cases began in June 2018.

35. On or about September 2018, Mr. Parker was notified by the Fayetteville VA that Dr. Levy's diagnosis was incorrect and that his erroneous pathology report had been modified to show the presence of Prostatic Adenocarcinoma.

36. Subsequent medical examinations and tests revealed that Mr. Parker's prostate cancer had significantly progressed since his 2009 misdiagnosis, giving him an estimated survival rate of only ten years. On or about December 5, 2018, Mr. Parker's prostate was removed, and complications from the procedure resulted in a nine-day hospitalization for Mr. Parker.

37. The lookback review of Dr. Levy's past cases identified 2,440 cases evaluated by Dr. Levy during his tenure at the Fayetteville VA that contained level 2 errors and 589 cases with level 3 major diagnostic discrepancies.

38. At all relevant times herein, Dr. Levy was an employee of the United States Department of Veterans Affairs, the Fayetteville VA, and the acts and/or omissions giving rise to these allegations occurred while Dr. Levy was acting within the course and scope of his office and employment.

39. On August 16, 2019, Dr. Levy was indicted for twelve counts of wire fraud, twelve counts of mail fraud, two counts of making false statements related to a health matter, two counts of making false statements to a federal investigator, and three counts of involuntary manslaughter, all related to conduct occurring during Dr. Levy's course and scope of employment at the Fayetteville VA.

40. On June 1, 2020, Dr. Levy pled guilty to one count of involuntary manslaughter and one count of mail fraud, for which he received a twenty-year sentence.

## JURISDICTIONAL PREREQUISITES

41.   All procedural prerequisites to filing this action have been satisfied, met, or otherwise waived, including the exhaustion of all administrative remedies under the Federal Tort Claims Act (FTCA).

42.   On or about July 13, 2020, Plaintiff submitted his administrative claims for damage and injury under the FTCA to the Fayetteville VA and Defendant.

43.   Claim forms were filed by Mr. Parker. The Standard Form 95 with related attachments is attached to this Complaint as "Exhibit C" and incorporated herein by reference.

44.   Pursuant to 28 U.S.C. § 2675(a), no denial of the claim or settlement has been reached as of the date of filing this Complaint, and therefore the administrative claims may be considered denied for the purpose of filing this pleading.

## COUNT I: MEDICAL MALPRACTICE

45.   Plaintiff re-alleges and incorporates the preceding paragraphs as if set forth verbatim herein.

46.   Through the employees and/or agents of Fayetteville VA, Defendant was negligent and such negligence was the proximate cause of the injuries and damages of Mr. Parker.

47.   In its treatment of Mr. Parker, Defendant, through its agents and/or employees, grossly failed to meet the applicable standard of care for medical providers in similar localities under similar circumstances.

48.   Defendant and its agents and/or employees breached the duty they owed to Mr. Parker, and this negligence deviated from the standard of care required for medical providers under these circumstances. The negligence consisted of, but is not limited to, the following:

   a. In the hiring, retention, and supervision of Dr. Levy in light of his history of known alcohol and substance abuse while on the job;

b. In failing to establish sufficient facility quality management procedures to oversee physicians;

c. In failing to foster a culture of accountability and transparency among employees;

d. In failing to appropriately and adequately investigate numerous claims of employee impairment at work;

e. In failing to take appropriate actions to ensure quality patient care following reports that Dr. Levy's breath at work smelled of alcohol;

f. In failing to take appropriate actions to ensure quality patient care following staff reports that Dr. Levy had an odor of alcohol, red, glassy eyes, and hand tremors while reviewing biopsy slides;

g. In disregarding staff allegations claiming that Dr. Levy subverted quality management programs and repeatedly misrepresented concurrences in case reviews;

h. In failing to take appropriate investigative actions, including repeated failures to administer blood alcohol tests or urine drug screens, to which Dr. Levy consented, after Dr. Levy appeared to be impaired at work;

i. In failing to adequately supervise employees with known substance abuse issues whose potential impairment could foreseeably cause substantial harm to patients;

j. In failing to conduct an adequate and comprehensive review of Dr. Levy's prior case work following the verification by blood alcohol content testing that Dr. Levy was performing his duties at the Fayetteville VA while heavily under the influence of alcohol;

k. In reinstating Dr. Levy's privileges after Dr. Levy registered a blood alcohol content of 397.6 mg/dL while performing work as a pathologist for Defendant;

l. In violating VHA policies by repeatedly accepting and relying upon non-pathologist peer references to support Dr. Levy's reprivileging after confirmation of his impairment at work;

m. In failing to establish adequate measures to determine and/or evaluate accurate error rates in medical diagnoses by employees;

n. In failing to protect patients, including Mr. Parker, from harm;

  o. In failing to properly diagnose Mr. Parker;

  p. In failing to properly review and follow up on the diagnosis assigned to Mr. Parker;

  q. In failing to have in place adequate policies, procedures, and oversight to ensure that patients, including Mr. Parker, receive adequate care from sober, competent employees;

  r. In hindering proper review of the diagnosis assigned to Mr. Parker;

  s. In failing to take reasonable steps to identify errors in Mr. Parker's diagnosis and notify Mr. Parker and/or his family of errors determined; and

  t. In such other particulars as the evidence might show.

49. In rendering medical services, examinations, treatments, diagnoses and medical care for Mr. Parker, the Defendant failed to exercise the degree of skill and care that would be expected of an ordinarily prudent and competent healthcare provider under similar circumstances in the same or similar locality.

50. Further, the U.S. Department of Veterans' Affairs, including the Fayetteville VA, incentivized medical personnel, including Dr. Levy, to report a clinical error rate of less than five percent in exchange for monetary performance bonuses. Defendants failed to put in place adequate measures to ensure that the error rates reported by medical personnel were accurate. Dr. Levy repeatedly reported to the Fayetteville VA that his error rate was below five percent – reporting during some years that he had a zero percent error rate – to receive such bonuses; in reality, Dr. Levy's error rate at the Fayetteville VA was 9.98 percent. This error rate included at least 586 level 3 misdiagnoses. Dr. Levy was noted as an individual "who took shortcuts, who did not work up cases completely, who did not submit as many tissue sections from large major surgical cases that [he] should have, who did not follow through with the appropriate workup." Sentencing Transcript, at 137:4-23. Despite this, Dr. Levy received twenty-five percent of his performance

bonus for reporting an error rate of less than five percent, largely due to the Fayetteville VA's failure to establish adequate safeguards that could ensure the validity of the reported error rate and its failure to properly review Dr. Levy's self-reported error rates.

51. As a result of the Defendant's systemic failures, Dr. Levy was able to "create[] [his] own rules in how [he] w[as] going to operate and perform [his] duties as a pathologist" at the Fayetteville VA. Sentencing Transcript, at 137:15-23. Ultimately, during Dr. Levy's time at the Fayetteville VA, his "cases were not worked up completely. Diagnoses were rendered on insufficient information. And some of the errors [we]re just astounding that anybody would look at a slide and even consider the diagnosis that was put into the medical record." Sentencing Transcript, at 137:24-138:3.

52. Even if the Defendant never discovered that Dr. Levy was intoxicated while practicing medicine, the errors that were brought to the Defendant's attention by the Fayetteville VA's deputy pathologist, Dr. Paul Hendrycy, was enough that the Defendant knew or should have known a major problem existed at the Fayetteville VA regarding the medical care that was being rendered due to some improper diagnoses, insufficient procedures, and understaffing in the pathology department.

53. Each of those negligent acts and/or omissions by Defendant, singularly and/or in combination, proximately caused Mr. Parker's injuries.

54. As a direct and proximate result of Defendant's negligence:

   a. George M. Parker was required to seek and obtain additional medical treatment, incurring medical expenses as a result thereof.

   b. George M. Parker's enjoyment of life has been impaired, and his predicted life span has been shortened.

   c. George M. Parker did not receive appropriate care for and/or treatment and sustained serious injuries as a result.

13

        d. George M. Parker suffered great pain and mental anguish as a direct result of the aforementioned injuries.

55. Mr. Parker has suffered significant mental anguish and emotional distress as a result of his injuries. Moreover, the mental anguish and emotional distress of Mr. Parker has been exacerbated and aggravated by the recent discovery that the Fayetteville VA had numerous opportunities to prevent Dr. Levy from practicing medicine while impaired, to promptly review Mr. Parker's case following actual and constructive knowledge of Dr. Levy's impairment, and ultimately, to prevent the substantial injuries and shortened life expectancy of Mr. Parker. Finally, the pain and suffering of Mr. Parker has been significantly exacerbated by the Fayetteville VA's unconscionable and repeated failures to protect patients from substantial harm, and in creating, maintaining, and tolerating a healthcare system where a chronically impaired doctor could cause devasting consequences to hundreds of veterans without review, without reprise, and for over a decade at the Fayetteville VA, without consequence.

WHEREFORE, Plaintiff prays that the Defendant be ordered to appear and answer the Complaint herein; that upon final trial of this action Plaintiff be granted judgment against Defendant for his damages, in an amount in excess of that required for jurisdiction for compensation of medical expenses, conscious pain and suffering, and mental anguish; that Plaintiff recovers costs of suit herein expended and interest and the legal rate on all of the above; and that Plaintiff be awarded such other and further relief, both at law and at equity, to which this Court, in its discretion, may find it to be justly entitled.

        Respectfully submitted,

        GEORGE M. PARKER, PLAINTIFF

By:   _/s/ Monte Sharits_
Monte Sharits, Ark. Bar No. 2010137
Alan L. Lane, Ark. Bar No. 2003131
Matthew L. Lindsay Ark. Bar No 2004028
ODOM LAW FIRM, P.A.
161 W. Van Asche Loop, Suite 1
(479) 442-7575
(479) 442-9008 *fax*
msharits@odomfirm.com
alane@odomfirm.com
mlindsay@odomfirm.com

15